**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

CHRISTINE BOOHER,                                  :

                                     Case No. 3:10-cv-189

                Plaintiff,

                                     District Judge Thomas M. Rose
                                     Magistrate Judge Michael R. Merz

   -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.                    :

**REPORT AND RECOMMENDATIONS**

        Plaintiff brought this action pursuant to 42 U.S.C. §405(g) for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

        Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence

is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520. First, if the claimant is currently engaged in substantial

gainful activity, the claimant is found not disabled.  Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments;  if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1. If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded.  20 C.F.R. §404.1520(d).  Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment;  if not, the claimant is found not disabled.  Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform.  *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

   Plaintiff filed an application for SSD on November 26, 2002, alleging disability since October 4, 2002.  (Tr. 81-83).  The Commissioner denied Plaintiff's application initially and on reconsideration.  (Tr. 68-71; 64-66).  Plaintiff took no further appeal.

   Plaintiff filed a second application for SSD on May 18, 2004, alleging disability from December 6, 2002, due to fibromyalgia, chronic fatigue and immune dysfunction syndrome, and high blood pressure.  (Tr. 77-80p 117).  The Commissioner denied Plaintiff's application initially and on reconsideration. (Tr. 61-63; 57-59). Administrative Law Judge James Knapp held a hearing, (Tr. 844-62), following which he determined that Plaintiff is not disabled. (Tr. 14-38). The Appeals Council denied Plaintiff's request for review, (Tr. 6-9), and Judge Knapp's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Knapp found that she has severe mild lumbar and cervical degenerative disc disease, fibromyalgia, mild osteoarthritis of both knees, mild to moderate obesity (severe in combination with her musculoskeletal impairments), and left hip septic arthritis beginning January 28, 2007, and status post left hip posterior arthrotomy with irrigation and debridement on February 3, 2007, but that she does not have an impairment or combination of impairments that meets or equals the Listings. (Tr. 18, ¶ 3; Tr. 31, ¶ 6). Judge Knapp found further that Plaintiff was not able to lift or carry more than twenty-five pounds frequently and fifty pounds occasionally, crawl or climb, do more than occasional crouching, stooping, kneeling, or reaching above shoulder level, or work at unprotected heights, around moving machinery, at temperature extremes, or in wet or humid areas. (Tr. 31, ¶ 7). Judge Knapp found additionally that since January 1, 2007, Plaintiff was not able to lift more than ten pounds frequently or twenty pounds occasionally. *Id.* Judge Knapp then found that Plaintiff was able to perform her past relevant work as an accounting supervisor. (Tr. 38, ¶ 8). Judge Knapp concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. (Tr. 38).

In her Statement of Errors, Plaintiff does not challenges the Commissioner's findings with respect to her alleged mental impairment or her alleged physical impairments beyond her fibromyalgia. (Doc. 12). Therefore, the Court will focus its review on the evidence related to Plaintiff's fibromyalgia.

Treating neurologist Dr. Burkhart noted on March 26, 2002, that Plaintiff reported numbness of her left extremities, pain involving the entire left hemibody, occasional aching bi-occipital headaches, and episodes of vertigo. (Tr. 242-43). Dr. Burkhard reported that Plaintiff's neurological examination was normal and he identified Plaintiff's diagnosis as left hemibody

paresthesias and pain etiology undetermined, rule out demylinating disease, rule out vasculitis, and rule out Lyme's disease. *Id.* On April 8, 2002, Dr. Burkhart noted that Plaintiff reported that her symptoms remained the same with the additional complaint of some fatigue throughout the day and sleep disturbances. (Tr. 241).

The record contains a copy of treating physician Dr. Ahn's office notes dated April 26, 1986, through March 20, 2007. (Tr. 317-56; 790-813). Those noted reveal that Dr. Ahn treated Plaintiff for various medical conditions and complaints including fibromyalgia, hypertension, cholelithiasis, and fatigue. *Id.*

Dr. Ahn reported on June 26, 2004, that he had been treating Plaintiff for twenty years, her diagnoses were fibromyalgia, hypertension, cholelithiasis, and reflux, that she had generalized fatigue, myalgias, and arthralgias, and that she was able to sit and stand/walk each for two hours in an eight-hour day, needed to get up and move about every thirty to forty minutes for twenty to thirty minutes, and that she was able to lift/carry up to five pounds frequently and twenty pounds occasionally. *Id.* Dr. Aha also reported that Plaintiff would need to take unscheduled breaks at unpredictable intervals during an eight-hour workday, would be absent from work more than three times a month as a result of her impairments, and that his opinion was based on Plaintiff's subjective complaints because she exhibited no objective findings. *Id.*

On March 7, 2005, Dr. Ahn reported that Plaintiff had a history of fibromyalgia for the last three years, did not have specific abnormal findings physically, but functionally she was unable to keep her daily activity levels due to arthralgia, myalgia, fatigue, and difficulty with concentration, and that she was unable to hold a gainful job in the future. *Id.*

Dr. Ahn reported on July 1, 2005, that Plaintiff had been evaluated and treated for

5

fibromyalgia by a rheumatologist, that she still complained of generalized fatigue, weakness, myalgia, and arthralgias, and that there was not objective data to assess her functional level, but that he did not think that Plaintiff was able to return to work for a gainful job. (Tr. 318).

In an undated report, Dr. Ahn noted that Plaintiff's clinical findings and symptomatology included generalized fatigue, myalgias, and arthralgias, that her experience of fatigue, pain, and other symptoms constantly interfered with her ability to attend and concentrate, and that she was not able to hold a gainful job in the future. (Tr. 317). Dr. Ahn confirmed his June 26, 2004, opinion as to Plaintiff's residual functional capacity. *Id.*

The record contains a copy of treating rheumatologist Dr. Madan's office notes dated October 9, 2002, through April 15, 2003, which reveal that Dr. Madan treated Plaintiff for fibromyalgia. (Tr. 224-34). When Dr. Madan first evaluated Plaintiff, he reported that she had eighteen out of eighteen tender points and was exquisitely tender and that her history and physical examination supported the diagnosis of fibromyalgia. *Id.* On November 8, 2002, Dr. Madan reported that he did not support long-term disability for his patients because he felt they got worse if they stopped working. *Id.* Dr. Madan noted on December 17, 2002, that Plaintiff was "doing quite well", that she had "quit her job and is planning on doing something that she really enjoys", and that she was "spending a lot more time in the church practicing her music." *Id.* On April 15, 2003, Dr. Madan noted that Plaintiff had eighteen out of eighteen trigger points and that she was participating in occupational therapy and seeing a chiropractor. *Id.*

The record contains treating rheumatologist Dr. Badreddine's office notes dated November 3, 2005, through April 19, 2007. (Tr. 357-66, 788-89). At the time Dr. Badreddine first evaluated Plaintiff, she reported that Plaintiff demonstrated tender points for fibromyalgia especially

in the neck, costochondral junction, gluteal region, greater trochanteric area, elbow pad, and knee pad on the medial part.  *Id.*  Dr. Badreddine identified Plaintiff's diagnoses as a few years history of fibromyalgia and bilateral knee pain mechanical in nature.  *Id.*  On March 19, 2007, Dr. Badreddine reported that Plaintiff had trigger points present at multiple locations, her prognosis was stable at present, and that she complained of sleep disturbances and fatigue.  (Tr. 814-19).  Dr. Badreddine also reported that in an eight-hour day, Plaintiff was able to sit for two to three hours and stand/walk for two hours, was required to get up and move around every two to three hours for two to three hours before she was able to sit again, and that it would be necessary for her to not stand/walk continuously in a work setting.  *Id.*  Dr. Badreddine noted that Plaintiff was able to lift/carry up to ten pounds occasionally, was able to perform low stress jobs, that she would require two to three unscheduled rest breaks in an eight-hour day, and that she had multiple symptoms related to her fibromyalgia and osteoarthritis.  *Id.*

Plaintiff was hospitalized January 26 to February 7, 2007, for treatment of left hip septic arthritis.  (Tr. 447-787).  During that hospitalization, Plaintiff underwent a left hip posterior arthrotomy with irrigation and debridement.  *Id.*   On February 20, 2007, treating surgeon Dr. Hellwarth reported that Plaintiff had a fairly prominent limp on the left, but that there was no evidence of infection. *Id.*  Dr. Hellwarth reported on March 20, 2007, that Plaintiff was ambulating with a cane and continued to have a limp on the left.  *Id.*

The record contains a copy of treating chiropractor Michael Johnson's office notes which reveal that Plaintiff received chiropractic treatment during the period January10 to at least May 9, 2004.  (Tr. 309-15).

Consulting orthopedic surgeon Dr. Vedantam noted on November 29, 2006, that

7

Plaintiff reported a history of fibromyalgia for the last four and a half years, that she had pain, weakness, and numbness in her neck, shoulders, and arms, and that her treatment included massage and ultrasound treatments. (Tr. 369-71). Dr. Vedantam also noted that Plaintiff had diffuse tenderness over the cervical spine posteriorly in the midline as well as over the trapezius bilaterally, range of motion of her cervical spine was limited at extremes of lateral rotation and flexion, and that her motor, sensory, and reflex exams were normal. *Id.* Dr. Vedantam reported that Plaintiff had full range and painful movements in both shoulders, negative straight leg stretch, normal motor and sensory exams of her lower extremities, and normal gait. *Id.* Dr. Vedantam reported further that x-rays of Plaintiff's cervical spine revealed degenerative changes from C5 to C7, an MRI revealed mild central disc protrusion at C5-6 causing minimal spinal canal stenosis and mild right neuroforaminal narrowing, and that EMG and nerve conduction studies performed elsewhere were reported to be normal. *Id.* Dr. Vedantam identified Plaintiff's diagnoses as chronic cervicalgia, degenerative spondylosis of the cervical spine, mild cervical spinal canal stenosis at C5-6, and a history of fibromyalgia. *Id.*

Plaintiff argues in her Statement of Errors that the Commissioner erred by failing to follow the treating physician rule and by failing to properly evaluate her credibility. (Doc. 12).

In support of her first Error, Plaintiff essentially argues that the Commissioner failed to give good reasons for the weight he gave to treating physicians Drs. Ahn's, Badreddine's, and Madan's opinions.

"In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards." *Blakley v. Commissioner of Social Security,* 581 F.3d 399, 406 (6th Cir. 2009). "One such standard, known as the treating physician rule, requires the ALJ to

generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone of from reports of individual examinations, such as consultative examinations or brief hospitalizations."

*Id.*, *quoting*, *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544, (6th Cir. 2004), *quoting,* 20 C.F.R. § 404.1527(d)(2).

"The ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley,* 581 F.3d at 406*, quoting, Wilson,* 378 F.3d at 544*.* "On the other hand, a Social Security Ruling[1] explains that '[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'" *Blakley, supra, quoting,* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996). "If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,*582 F.3d at 406*, citing, Wilson,* 378 F.3d at

---

FN 1. Although Social Security Rulings do not have the same force and effect as statutes or regulations, "[t]hey are binding on all components of the Social Security Administration" and "represent precedent, final opinions and orders and statements of policy" upon which the agency relies in adjudicating cases. 20 C.F.R. § 402.35(b).

544, *citing* 20 C.F.R. § 404.1527(d)(2).

"Closely associated with the treating physician rule, the regulations require the ALJ to 'always give good reasons in [the] notice of determination or decision for the weight' given to the claimant's treating source's opinion." *Blakley,* 581 F.3d at 406, *citing,* 20 C.F.R. §404.1527(d)(2). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley,* 581 F.3d at 406-07,*citing,* Soc.Sec.Rule 96-2p, 1996 WL 374188 at *5. "The *Wilson* Court explained the two-fold purpose behind the procedural requirement:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. *Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."

*Blakley,* 581 F.3d at 407, *citing, Wilson,* 378 F.3d at 544. "Because the reason-giving requirement exists to ensure that each denied claimant received fair process, the Sixth Circuit has held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley, supra, quoting, Rogers v. Commissioner of Social Security.,* 486 F.3d 234, 253 (6th Cir. 2007)(emphasis in original).

The Sixth Circuit has recognized that fibromyalgia can be a severe impairment and

that, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 243, (6th Cir. 2007), citing *Preston v. Secretary of Health & Human Services,* 854 F.2d 815, 820 (6th Cir. 1988)(per curiam). Fibromyalgia patients manifest normal muscle strength and neurological reactions and have a full range of motion. *Rogers, supra.* The process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials. *Id.* (citation omitted).

There is no dispute that the physicians of record have identified Plaintiff's diagnosis as, *inter alia,* fibromyalgia. However, the presence of a diagnosis alone is never conclusive evidence of disability. *See, Young v. Secretary of Department of Health and Human Services,* 925 F.2d 146 (6th Cir. 1990). The mere diagnosis of an impairment does not indicate the severity of the condition nor the limitations, if any, that it imposes. *Id.* The issue, of course, is whether Plaintiff is totally disabled as a result of fibromyalgia.

In considering Drs. Ahn's, Badreddine's, and Madan's opinions, Judge Knapp determined that they were not entitled to controlling or even deferential weight because they were not supported by the record as a whole including the objective medical evidence and Plaintiff's activities of daily living, response to medications, and course of treatment. (Tr. 35-36).

As noted above, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs. Therefore, rejecting a treating physician's opinion that a patient with fibromyalgia is disabled simply on the basis that the opinion is not supported by objective medical evidence would arguably be error. However, in this case, in rejecting Drs. Ahn's, Badreddine's, and Madan's opinions, Judge Knapp also relied on Plaintiff's

11

activities of daily living, response to medications, and course of treatment. Essentially, Judge Knapp determined that Drs. Ahn's, Badreddine's, and Madan's opinions were inconsistent with Plaintiff's activities, her own reports of improvement, and her activities of daily living.

The record reveals that although Dr. Ahn identified Plaintiff's diagnosis as fibromyalgia in May, 2002, Plaintiff continued to work until December, 2002. (Tr. 241; 348). However, as note above, on December 17, 2002, Dr. Madan reported that Plaintiff was "doing quite well", that she had "quit her job and is planning on doing something that she really enjoys", and that she was "spending a lot more time in the church practicing her music." (Tr. 255). Additionally, in November, 2002, Dr. Ahn noted that Plaintiff reported that she felt better since doing water aerobics and receiving chiropractic treatment. (Tr. 345). Similarly, in November, 2002, Dr. Madan reported that Plaintiff had early morning stiffness which lasted for a half-hour and then it was all over and that she went to a health club and did cardoivascular exercises and that she felt worse when she did not exercise. (Tr. 227). Interestingly, as noted above, on November 8, 2002, Dr. Madan reported that he did not support long-term disability for his patients because he felt they got worse if they stopped working.

With respect to Dr. Badreddine, in November, 2005, she noted that Plaintiff reported that she had experienced relief with water aerobics. (Tr. 360). In addition, Plaintiff reported to Dr. Badreddine in February, 2006, and again in September, 2006, that prescribed medications were helping to relieve her fibromyalgia-related symptoms. (Tr. 359, 789).

Drs. Ahn's, Badreddine's, and Madan's opinions are also inconsistent with the information Plaintiff reported to other health care experts. For example, examining psychologist Dr. McIntosh noted in September, 2004, that Plaintiff reported that she engaged in a wide variety

of activities including driving, playing the piano in her church's choir, caring for her pets, dusting, running the vacuum, doing laundry, doing some cooking, working jigsaw puzzles, performing water exercises, watching movies, reading, attending church, and shopping. (Tr. 253). Further, Plaintiff reported to her occupational therapist that going to water aerobics seemed to keep her pain levels down and seeing a chiropractor helped increase her energy level. (Tr. 207). Plaintiff reported that she had benefitted "a lot" from the therapy, (Tr. 255), and when she completed therapy in February, 2003, Plaintiff reported that on a scale of zero to ten, her pain was zero at her best and two at her worst. (Tr. 198).

Finally, at the hearing Plaintiff testified that medications reduced her pain from a level of eight to a level of four on a ten-point scale and that she continued to perform essentially the same activities she reported to Dr. McIntosh. (Tr. 847-55). Plaintiff also testified that water aerobic exercise, chiropractic treatment, and stretching exercises helped alleviate her fibromyalgia symptoms. *Id.*

Under these facts, the Commissioner had an adequate basis and articulated that basis for rejecting Drs. Ahn's, Badreddine's, and Madan's opinions.

Plaintiff argues next that the Commissioner erred by rejecting her credibility.

It is, of course, for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 247 (6th Cir. 2007)(citations omitted). An administrative law judge's credibility findings are entitled to considerable deference and should not be lightly discarded. *See, Villarreal v. Secretary of Health and Human Services,* 818 F.2d 461 (6th Cir. 1987); *Casey v. Secretary of Health and Human Services,* 987 F.2d 1230 (6th Cir. 1993). Determination of credibility related to subjective

complaints rests with the ALJ and the ALJ's opportunity to observe the demeanor of the claimant is invaluable and should not be discarded lightly. *Gaffney v. Bowen,* 825 F.2d 98 (6th Cir. 1987).

However, the ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." *Rogers, supra* (citation omitted). Rather, such determination must find support in the record. *Id.* Whenever a claimant's complaints regarding symptoms or their intensity and persistence are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Id.* The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. *Id.* Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant while inconsistency, although not necessarily defeating, should have the opposite effect. *Id.*

For the same reasons that the Commissioner had an adequate basis for rejecting Drs. Drs. Ahn's, Badreddine's, and Madan's opinions, he had an adequate basis for rejecting Plaintiff's credibility. Specifically, Plaintiff's allegations and subjective complaints that she is totally disabled by fibromyalgia are inconsistent with her own reports to her health card providers as well as her reports to Dr. McIntosh and the occupational therapist and her testimony at the hearing. Accordingly, the Commissioner did not err as Plaintiff alleges.

The Court's duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact

to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

March 18, 2011.

*s/ Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).